AUGUST BIEWER *et al.* Appellees, *vs.* L. ROBERT MUELLER
*et al.* Appellants.

*Opinion filed April 18, 1912—Rehearing denied June 5, 1912.*

1. CONTRACTS—*when execution of a deed does not extinguish the contract.* The execution of a deed in pursuance of a contract for the sale of real estate extinguishes the contract where the conveyance of the property. is the entire subject matter of the contract, but where the contract requires the performance of other acts than the conveyance it is not extinguished, but remains in force until such other acts are fully performed.

2. SAME—*when party is bound to deliver immediate peaceable possession.* Where hotel property in possession of a manager is traded by the owner, who represents to the purchaser that the manager has no interest or claim in the property and that the purchaser need not deliver possession of his own property until he has been put in peaceable possession of the hotel, the owner of the hotel is bound to put the purchaser in immediate peaceable possession, and upon his failure to do so the purchaser, who has not surrendered possession of his own property or exercised any acts of ownership over the hotel, may rescind the contract.

3. SAME—*when statements as to the value of property are not mere opinions.* Statements as to the value of property, made to induce another to buy or invest money, are generally treated as expressions of opinion, and if so intended and understood do not constitute fraud, in the absence of concealment or misrepresentation of material, extrinsic facts; but false statements as to value made by a person having superior means of knowledge, with the intention that they shall be understood as statements of fact, and which are so understood and regarded by the other party, constitute fraud.

4. MASTERS IN CHANCERY—*statute authorizes fees for taking testimony and also for the amount paid the stenographer.* Under section 20 of the Fees and Salaries act, as amended in 1907, the court may allow the statutory fees to the master for taking and reporting the testimony and may also allow as costs the amount paid to the stenographer by the parties for taking such testimony, where the master certifies that the services of the stenographer were necessary and attaches to his report a certified copy of the testimony taken by the stenographer.

5. SAME—*Supreme Court may reduce allowance for examining questions in issue and reporting conclusions.* The Supreme Court will reduce the trial court's allowance to the master in chancery

for examining the questions in issue and reporting his conclusions where it is of the opinion that the master's charges are excessive, both as to the price charged and the time consumed by him in investigating the questions and preparing his report.

Appeal from the Circuit Court of Cook county; the Hon. Richard S. Tuthill, Judge, presiding.

Geeting, Potts & VanDellen, (Henry C. Geeting, of counsel,) for appellants.

Matz, Fisher & Boyden, for appellees.

Mr. Justice Dunn delivered the opinion of the court:

A bill was filed to set aside a deed for certain real estate in the city of Chicago and an assignment of rents, and an option to purchase dependent on such deeds. Answers and cross-bills were filed, a hearing was had, a decree was rendered granting the relief prayed for in the original bill and dismissing the cross-bills, and an appeal was taken.

A review of the decree requires an examination of the evidence, which is conflicting. The parties and witnesses contradict one another as to substantially every material part of the transaction capable of dispute. The following facts, however, are admitted or established:

In 1908, and for some years previous, August Biewer was the owner in fee simple, subject to a mortgage for $6000, of lots 57 and 58 in a re-subdivision of certain lots in Chicago. This property was situated at the north-east corner of North Clark street and Edgewater place, fronting fifty feet on North Clark street, was one hundred and twenty-five feet deep, and upon it was a two-story building having two rooms on the lower floor, in one of which a saloon and in the other a pool-room was conducted. The upper floor consisted of living apartments. August Biewer also owned lots 59 and 60 in the original subdivision, which fronted on Edgewater place and lay east of lots 57 and 58,

from which they were separated by an alley. In January, 1908, L. Robert Mueller acquired the title, subject to a mortgage for $6000, to lot 15 in Logansport, Indiana, upon which was a three-story brick building used as a hotel. He also controlled the title to a quarter section of land in Anoka county, Minnesota, and certain lots in Minneapolis, which real estate was all mortgaged for more than its value. The hotel property at Logansport had belonged to a man named Johnson, and in December, 1907, had been sold under a foreclosure decree to the Michigan Mutal Life Insurance Company and the time for redemption was about to expire. Negotiations for the purchase of the property by Mueller were begun through Meinshausen, who was a co-defendant in the circuit court, and an extension of the time of redemption was obtained. The negotiations between Johnson and Mueller failed, and Mueller having advanced $4000 to the insurance company, then purchased the property from it. He put his brother-in-law, J. C. Hansen, in charge of the hotel as manager. On July 23, 1908, Johnson sued Mueller in Indiana for $12,000 damages on account of their dealings in regard to the hotel property and asked to have the amount declared a lien on the real estate. Through Meinshausen, who was a real estate dealer in Chicago, Biewer and Mueller were brought together on July 26, 1908, to negotiate a trade of Biewer's property for the hotel. Biewer and his wife, a few days later, went to Logansport to see the hotel, and after their return Biewer gave to Meinshausen written authority to trade lots 57 and 58, at a valuation of $32,500 to $35,000, for the hotel property, at a valuation of $25,000, and agreed to pay him $1500 commission when the deal should be consummated. On the evening of August 26 Mueller and his wife, Meinshausen and James M. Mayfield, who was a friend and confidant of Meinshausen and spent a great deal of time in his office, went to Biewer's place, having with them a deed, executed by James F. Tallman, conveying to

Biewer the hotel property. Mueller had conveyed the property on July 30 to Tallman, who had no other connection with the matter than to take and hold title for Mueller and to convey at the latter's request. After a conference of several hours' duration between the persons named and Biewer and his wife, the latter executed and acknowledged before Mrs. Mueller, as a notary public, the deed in controversy, in which Tallman was named as grantee. Tallman's deed was delivered to Biewer, who was paid $6000 in cash. An assignment of the rents of lots 57 and 58 to the amount of $1500 was made to Meinshausen and accepted by him in payment of his commission. There were also delivered to Biewer two deeds for the Minnesota property which has been mentioned. One, dated December 31, 1907, purported to be executed by the Columbia Finance Company, a corporation, and to convey certain lots in Minneapolis, Minnesota, subject to mortgages amounting to $2900. The other, dated December 23, 1907, purported to be executed by the United Friends Church, a religious society, and to convey 160 acres of land in Anoka county, Minnesota, subject to a certain mortgage. No grantee was named in either of these deeds, the space for the grantee's name being left blank in each, and each contained a clause assuming the mortgage debt and agreeing to pay it as a part of the purchase money. Two days later Biewer went to Logansport to take possession of the hotel, but Hansen refused to surrender possession unless he should be paid $600. Biewer recorded his deed, but being unable to obtain possession telephoned to his wife in Chicago and she refused to give possession of the property there. Biewer's deed to Tallman, besides lots 57 and 58, conveyed also the lots east of the alley, 59 and 60, and upon his return to Chicago Biewer claimed that they were inserted after the execution of the deed and were not included in the sale. Tallman, with Mueller's consent, re-conveyed the latter two lots to Biewer. Biewer went back to Logansport with his lawyer, but Hansen continued

to insist upon his claim and his refusal to give possession. Biewer refused to allow suit to be brought in his name for the possession. He learned early in September that the value of the Minnesota property was less than the amount of the liens against it. On October 6 Biewer tendered to Mueller and to Tallman a deed of the hotel property, $6000, and the other deeds and papers he had received. The tender was refused, and on October 9, 1908, this suit was begun. Biewer has never been out of possession of his property and has never had possession or exercised any ownership of the Logansport property.

It is the appellees' contention that the deed to Tallman was changed after its execution by adding the description of lots 59 and 60, or that the description was inserted in the deed without their knowledge prior to its execution and in violation of their agreement; that Mueller knowingly falsely represented that Hansen had no claim to the possession of the property and that he made none; that he was merely Mueller's manager and that there was nothing which could interfere with Biewer's getting possession, and that Mueller agreed that he would put Biewer in possession of the hotel before Biewer should surrender possession of his property; that Mueller represented that the Johnson suit was without foundation and of no importance, and that as indemnity against it he would turn over the deeds to the Minnesota property, which he represented would be ample security against the Johnson claim, the property being worth $16,000 and the encumbrance on it only $4000, while, as Mueller well knew, the deeds were no security at all, because, even if they had conveyed the title, the $4000 encumbrance, which the grantee assumed, exceeded the value of the property, and the deeds would impose a liability instead of affording security. Biewer and Mueller squarely contradict one another as to lots 59 and 60. The former testifies that he told Mueller those lots were not in the deal,—that it was only the saloon he wanted to sell; while

the latter testifies that he told Biewer he would not think of buying the property without those two lots; that he considered them very essential as an accessory of the business. The authority given to Meinshausen by Biewer was to trade lots 57 and 58, only, and it was on the basis of that authority that the trade was made. No one but Mueller testifies to anything indicating that Biewer was trading more than the two lots. Meinshausen and Mayfield, who were present when the trade was closed, heard nothing of the other two lots and supposed the deed conveyed only lots 57 and 58. Tallman immediately conveyed them back when demand was made, and Mueller consented. While from the evidence it is exceedingly improbable that there was any blank in the deed when it was signed or that the description of lots 59 and 60 was added afterward, it is not improbable that in the typewritten deed, which was introduced in evidence, the few words constituting that description may have been overlooked. The finding that the description of lots 59 and 60 was wrongfully inserted in the deed without the knowledge of the grantors is in accordance with the evidence.

The evidence shows that Mueller gave Biewer to understand that he could take immediate possession of the hotel without delay or expense, and that while the Johnson claim of $12,000 was baseless, the deeds for the Minnesota land which Mueller would turn over would be ample security against it. It is true, the testimony is contradictory. Biewer and Mueller contradict one another, but the probabilities are with Biewer. He was in possession of his own property and there was no obstruction to his surrendering possession. There was no occasion for his trading his property for lawsuits, and no evidence, but Mueller's testimony, of his desire to do so. According to the latter, Biewer, after hearing from Mueller a detailed account of his dealing with Johnson and learning that their trade fell through because Johnson learned that Mueller's Minnesota land was

worthless and that he had sued Mueller for defrauding him in that transaction, was entirely willing to take the chance of Johnson's lawsuit and of getting possession from Hansen. Biewer denies all this. Hansen had been in possession of the hotel, under some arrangement with Mueller, ever since the latter had owned it. Biewer testified that Mueller told him that Hansen not only had no claim on the property but that he made none, and agreed to send Mrs. Mueller and Meinshausen to Logansport to deliver possession of the property to Biewer, and that Biewer should not give possession of his property until actually in possession of the hotel. The action of the parties was in accordance with this version of the contract, for Biewer did not give possession but left his wife in charge while he went to Logansport with Mrs. Mueller and Meinshausen, and when he could not get possession there at once telephoned her not to surrender possession of the Chicago property, and the possession never was given.

The appellants insist that even if there was an agreement to put Biewer in possession of the hotel it was merged in the deed. There was no written contract between the parties for the exchange of these properties. The agreement as found by the master, and, in our judgment, in accordance with the evidence, was that Biewer was to be put in possession of the Logansport property and until that was done he should not give possession of his property. Deeds were exchanged in part performance of the contract. The deeds did not, however, purport to express the contract, and were certainly not a performance of that part of the contract which required possession to be delivered. If the contract of the parties had first been reduced to writing it would have provided for the execution of deeds by the respective parties, and would then have stated that Mueller agreed to put Biewer immediately in the peaceable possession of the hotel before he should receive possession of the Chicago property. The execution of a deed in pursuance

of a contract of sale of real estate where the conveyance of the property is the entire subject matter of the contract extinguishes the contract, but not so where the contract provides for the performance of other acts than the conveyance. In such case the contract remains in force as to such other acts until full performance. (*Laflin* v. *Howe,* 112 Ill. 253; *Platt* v. *Ætna Ins. Co.* 153 id. 113; *Ludeke* v. *Sutherland,* 87 id. 481.) In view of Mueller's representations in regard to the character of Hansen's possession and to the latter's making no claim of right to the premises, and of Mueller's agreement to put Biewer in actual possession of the hotel, Mueller was bound to deliver immediate peaceable possession to Biewer. It is not sought here to interpose this agreement as a defense to a suit for possession under the deed executed by Biewer or to attach it as a condition to the deeds, but only to rescind the contract for a failure to comply with its terms and misrepresentation in procuring it.

It is urged by the appellants that the conveyance of the Minnesota land did not enter into the consideration of the deed but was a mere collateral arrangement. The written receipt given by Biewer for these deeds, together with the other evidence, shows that these deeds were a material part of the trade and were turned over to Biewer as security against Johnson's claim. They constituted his only security against that claim except Tallman's liability on the covenants in the deed, if any. Mueller made light of the Johnson suit, and claims that Biewer investigated it and regarded it as of no importance. Yet Biewer did take security against it, or he thought he did, and he contradicts Mueller. The intention of the delivery of the deeds to Biewer was to make him believe that he had security against the claim which Johnson was prosecuting. The testimony of all the witnesses in regard to the trade, together with Mueller's admissions made afterward, shows that Biewer was induced to believe that the property was worth $16,000

and that after the mortgages were deducted it was worth the amount of Johnson's claim.

It is argued for the appellants that the value of the property was equally open to the investigation of both parties and was a matter of opinion against the false statement, of which equity will not relieve. It is true that Biewer might have gone to Minnesota and seen the land, but it is not true that the parties had, at the time the trade was made, equal means of knowledge. Mueller owned the land, had seen it and would be presumed to know something of its value, while Biewer had never seen the land, which was in a distant State. One cannot, by taking advantage of such a situation, induce another to accept his false statement of a fact and escape the consequences of his fraud by saying the other had no right to believe him. The property about the misrepresentation of the value of which complaint is made, was not the property directly involved in the trade. It was collateral to the principal transaction, part of whose terms it was designed to secure, and the representation was made, not to induce the appellees to purchase the property, but to accept it as security. The general rule is, that statements as to the value of a business or of property, made to induce one to buy or invest money, are treated as expressions of opinion, only, and if so intended and understood do not constitute fraud, in the absence of any concealment or misrepresentation of material, extrinsic facts. "The reason of the rule is that such statements are expressions of opinion; but where they are made with the intention that they shall be understood as statements of fact, and not as the expressions of opinions, they will constitute fraud." (*Leonard* v. *Springer,* 197 Ill. 532; *Murray* v. *Tolman,* 162 id. 417; *Allen* v. *Hart,* 72 id. 104.) The false statement of value was here made by Mueller, having superior means of knowledge, and was relied upon as a matter of fact and not opinion. It constituted fraud, which violated the agreement entered into partly in reliance upon it. Upon

discovering the misrepresentations made to him, Biewer, without any unreasonable delay, tendered back all that he had received, demanded a re-conveyance of his property, and upon this being refused began suit to compel it.

The decree requires Biewer to convey to Mueller the hotel property by quit-claim deed and Mueller to convey to Biewer lots 57 and 58 by quit-claim deed, a proper and sufficient conveyance in fee simple. It is insisted that the conveyances required should be upon terms of equality. They are so, both being quit-claim deeds. It is also insisted that the conveyances should warrant against encumbrances through the act or negligence of the present holders. The appellees were under no obligation to protect the hotel property, and if encumbrances have arisen they cannot be charged to their negligence. Encumbrances pending the suit are subject to the decree. There is no occasion for special warranties. The decree also properly deducted from the $6000 to be re-paid to Mueller, the expenses incurred by Biewer in moving to Logansport to take possession of the hotel and the costs in the cause.

Objection is made to the master's fees. The master was allowed $348.75 for taking and certifying 930 pages of testimony, 250 words to the page, at fifteen cents for 100 words. By stipulation of the parties a stenographer was employed to take the testimony and was paid by them $348.75, which was taxed as costs in accordance with their stipulation. The allowance to the master was at the rate fixed by the statute for taking and reporting testimony. The statute, since its amendment in 1907, further provides that the court may also include as a part of the master's fees a reasonable allowance, not exceeding fifteen cents a hundred words, for stenographer's services in cases where the master shall certify that a stenographer was necessarily employed, and shall attach to his report a certified copy of the testimony taken by the stenographer. The master certified that a stenographer was necessarily employed, and at-

tached to his report a certified copy of the testimony taken by the stenographer. (Hurd's Stat. 1909, sec. 20, p. 1143.) The two items of $348.75 each were allowed in accordance with the statute.

The master made, and the court approved, a further allowance of $360 for examining the questions in issue and reporting conclusions, being for "ten days and two hours at the rate of $35 per day of seven hours, or $5 per hour." The evidence was taken before the master on various days from June 30, 1909, to February 18, 1910, when it was closed. A schedule contained in the master's report shows that afterward, on different days until October 3, 1910, the master was engaged in examining the record and considering questions of fact, two days and one hour; in hearing arguments, one day and four hours; in looking up authorities and working on questions of law, two days; and in preparing and settling his report, four days and four hours. While the testimony taken before the master covers 930 pages of typewriting, the issue of fact was narrow. The substantial controversy of fact arose over the conversations at Biewer's place on July 26 and August 26. On these occasions the fraud was committed or not at all. The other evidence, so far as material to the main controversy, was important only as corroborative of one side or the other as to what occurred then. Six witnesses testified whose evidence was material on the main issue. While their examination and cross-examination were sometimes needlessly prolix, the master, after having listened to their testimony as given, certainly ought not to have required two days for the examination of it, as written out, to determine which side to believe. If the lawyers chose to argue for an unnecessary day or two, probably their clients will have to pay for the time. The time occupied in investigating the law and preparing the report seems disproportioned to the character of the questions involved. Either the time taken was too long or the price charged too high. We regard

both as excessive. For the master's service in examining
the questions in issue and reporting his conclusions $150
was sufficient compensation.

The decree of the circuit court will be modified by re-
ducing to $150 the allowance to the master for his services
in examining questions in issue and reporting his conclu-
sions, and as modified will be affirmed. The appellants will
pay two-thirds and the appellees one-third of the costs of
this court.

*Decree modified and affirmed.*

Per Curiam: In a petition for a rehearing it is urged,
among other things, that the decree improperly charges
Mueller with certain fees and expenses of attorneys and
other expenses incurred by Biewer. No mention was made
of these items in the appellants' original brief, and objec-
tion to them was therefore waived.